-IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JAMIL COOPER,                    :
    Plaintiff              :
                           :          No. 1:20-cv-2430
    v.                     :
                           :          (Judge Kane)
UNIT MANAGER MILLER, et al.,      :
    Defendants              :

## MEMORANDUM

As reflected by the Court's docket, there are several pending motions that have been filed
by Plaintiff Jamil Cooper ("Plaintiff"), who is proceeding pro se and in forma pauperis in the
above-captioned matter.  In those motions, Plaintiff seeks a temporary restraining order,
sanctions, and various relief concerning discovery, including the appointment of an expert
witness.  Also in his motions, Plaintiff asserts a desire to file an amended pleading in order to
name additional defendants, the identities of whom he only learned during the course of
discovery.  Thus, this Memorandum will address Plaintiff's various motions, as well as his desire
to file an amended pleading.

## I.    BACKGROUND

On December 29, 2020, Plaintiff, who is currently incarcerated at the State Correctional
Institution in Bellefonte, Pennsylvania ("SCI Rockview"), commenced this civil rights action by
filing a complaint pursuant to 42 U.S.C. § 1983 against a number of Defendants, including five
(5) unidentified individuals.  (Doc. No. 1.)  In an Order dated February 8, 2021, the Court
granted Plaintiff leave to proceed in forma pauperis and directed service of his complaint upon
the Defendants.  (Doc. No. 7.)  All of the identified Defendants waived service on March 9,
2021.  (Doc. No. 10.)

Plaintiff subsequently filed a "motion to serve additional interrogatories to Defendant John Wetzel" (Doc. No. 12) and a "motion for enlargement of time to serve complaint" (Doc. No. 13), seeking to learn the names of the unidentified Defendants and requesting a sixty (60)-day extension of time to locate those unidentified Defendants and effectuate service of the complaint upon them.  In an Order dated March 23, 2021, the Court granted both of Plaintiff's motions.  (Doc. No. 14.)

On April 8, 2021, the identified Defendants filed a motion to dismiss Plaintiff's complaint.  (Doc. No. 15.)  Plaintiff subsequently filed a motion for an extension of time to file an amended complaint to name the remaining unidentified Defendants.  (Doc. No. 19.)  The Court granted Plaintiff's motion (Doc. No. 20), and on June 1, 2021, Plaintiff filed a motion to amend (Doc. No. 23), along with his proposed amended complaint (Doc. No. 23-2).  On June 14, 2021, the Court granted Plaintiff's motion to amend and directed the Clerk of Court to docket Plaintiff's proposed amended complaint and exhibits as a separate docket entry in this matter. (Doc. No. 28.)   In addition, the Court denied, as moot, Defendants' motion to dismiss Plaintiff's original complaint.  (Id.)

Thus, Plaintiff is now proceeding on an amended complaint against the following employees of the Pennsylvania Department of Corrections ("DOC"): Unit Manager Miller; John Wetzel; Major Haldeman; Deputy Superintendent Houser; Safety Manager Breese; Sergeant Watson; Program Manager T. Miller; Food Service Manager Weaver; Facility Maintenance Manager Sampsel; Unit Manager D.A. Kuhn; Superintendent Mark Garman; Deputy Superintendent McMahon; Grievance Coordinator Brubaker; and Corrections Officers McClellan, Newpher, Kachik, Narehood, Fultz, Holdren, and Eyer.  (Id. at ¶¶ 5-71.)

2

In the amended complaint, Plaintiff alleges that he "has been subjected to gross inhumane and substandard prison conditions not consistent with his sentence and was the victim of retaliation." (<u>Id.</u> ¶ 4.) According to Plaintiff, SCI Rockview is "in need of drastic measure to maintain the up keep [sic] of its buildings to ensure the safety of it's [sic] prisoner population from sevre [sic] injury, sickness from disease[,] or death." (<u>Id.</u> ¶ 74.) Plaintiff alleges that he has provided notice to the administration about several health violations. (<u>Id.</u> ¶ 76.)

For example, Plaintiff avers that he submitted grievance #855986, in which he provided notice about a pigeon infestation. (<u>Id.</u> ¶ 77 (claiming that the pigeons leave spit and feces on the walls and that staff members have denied inmates access to cleaning supplies, leaving them in danger of contracting disease).) Plaintiff also avers that there are numerous fire safety violations, including wooden stairways, an inoperable fire suppression system, inadequate ventilation in the inmate housing area, and a lack of "lighted fire exit signs[.]" (<u>Id.</u> ¶ 78.)

Plaintiff also raises concerns regarding conditions in the Restricted Housing Unit ("RHU"), which consists of the "[l]ower three levels on the backside of D-block[.]" (<u>Id.</u> ¶ 80.) He alleges that, when staff use OC spray against an inmate in the RHU, "the inmates of D-block . . . are unaware of what [has] taken place and they become victims of the spray[, as] some [are] locked in their cells [a]sleep and awake to a gas chamber like circumstance." (<u>Id.</u> ¶ 81.) Plaintiff also alleges that, when an inmate sets fire to his mattress in the RHU, the smog goes into the cells of other inmates on D-block, and those inmates cannot breathe because of the inactive fire suppression system. (<u>Id.</u> ¶ 82.) Plaintiff also claims that there is "no existing sprinkler system on D-block or exit plan in [the event of a] fire[.]" (<u>Id.</u>) Plaintiff further alleges that inmates in the RHU make noise all night long, causing "the prison population of D-block unrest[.]" (<u>Id.</u> ¶ 83.)

In addition to these alleged conditions throughout the prison, Plaintiff also claims that on December 3, 2018, he woke up to find that his cell had been flooded with water, causing damage to books, correspondence with his lawyers, and documents related to other civil actions he has filed.  (Id. ¶ 86.)  Plaintiff alleges that he filed grievance #775488 (id. ¶ 87) and that he also notified counselor William Serifini that a copy of the prison's fiscal administration policy, which Plaintiff had received from the library, was damaged.  (Id. ¶ 88.)

Several days later, Plaintiff had an interview with Defendant Miller, who asked Plaintiff "to produce some damaged items from the flood[.]"  (Id. ¶ 89.)  According to Plaintiff, when Defendant Miller saw pages sticking together, he told Plaintiff "that even though some of the words . . . on the pages are smeared or sticking together your [sic] fine."  (Id.)  Defendant Miller offered to reimburse Plaintiff with copies of the prison policies that were destroyed, but only if Plaintiff agreed to withdraw his grievance.  (Id. ¶ 90.)  Plaintiff refused, and Defendant Miller terminated the interview, declining to reimburse Plaintiff for any of the damage.  (Id. ¶ 91.)  Plaintiff appealed the denial of administrative relief to Defendant Garman.  (Id. ¶ 93.)  Eventually, the grievance coordinator, Nicki J. Paul, gave Plaintiff copies of the prison policies that were destroyed and asked Plaintiff if he was willing to withdraw his grievance, which Plaintiff again refused to do.  (Id.)  Plaintiff alleges that Defendants Kachik, Fultz, and Narehood worked on D-block on the evening of December 3, 2018, and that they "watched as water[] entered in to [sic] various inmate cells" without notifying the inmates of the potential harm.  (Id. ¶ 94.)

Plaintiff alleges that his cell flooded again on January 23, 2019.  (Id. ¶ 96.)  He noticed that the water came from outside of his cell, and he asked a corrections officer if maintenance would be taking care of it.  (Id.)  The officer told Plaintiff that maintenance was aware and "kept

walking by, giving no notification to any of the sleeping inmates to pick up their property off of the floors[.]" (Id. ¶ 97.) Plaintiff and other inmates asked for squeegees to clean, but Defendant Watson denied that request. (Id. ¶ 98.) Undeterred, Plaintiff and other inmates used the squeegees from the showers, along with a mop and bucket, to clean the water. (Id. ¶¶ 98-99.) Plaintiff alleges that he later learned that the flood started from a vent in cell #416, "some twenty-five feet away from [his] cell." (Id. ¶¶ 100-01.) Plaintiff claims that the water destroyed several of his items, including towels, rugs, footwear, books, and various documents related to legal matters. (Id. ¶ 103.) Plaintiff also claims that Defendants Holdren, Eyer, and Fultz were on duty on D-block during the night on January 23, 2019, and that they did nothing when water started flooding into inmates' cells. (Id. ¶¶ 62, 68, 70.)

In addition to the incidents concerning his own cell, Plaintiff also alleges that flood waters come through the roof of D-block into the common areas and that, when these leaks happen, trash cans and buckets are used to catch the water. (Id. ¶¶ 106-07.) Plaintiff claims that Defendants Kuhn and Miller are aware of these leaks because they occur right in front of the Unit Manager's office. (Id. ¶ 107.)

Additionally, Plaintiff alleges that, on November 20, 2019, SCI Rockview was on lockdown. (Id. ¶ 108.) Plaintiff alleges that there were "several piles of food garbage . . . up and down 4 range[,]" including "macaroni food garbage" in front of his cell. (Id.) He alleges that Defendant McClellan kicked the food garbage into his cell, causing it to get all over Plaintiff's property. (Id. ¶¶ 110-11.) Plaintiff alleges that he filed grievance #836903 about this incident, as well as "various housing maintenance problems . . . including showers not being regularly cleaned, floors not being regularly swept and mopped, and the lack of access to cleaning

supplies." (Id. ¶ 112.) Plaintiff claims that he experienced numerous complications while trying to exhaust this grievance. (Id. ¶¶ 113-17.)

At some point after filing grievance #836903, Plaintiff was approached by Defendant Newpher. (Id. ¶ 118.) Defendant Newpher told Plaintiff that he had seen the video of the incident with Defendant McClellan and stated that he could see why Plaintiff would be mad, but then asked, "don't you think it's time to leave this thing alone[?]" (Id.) Plaintiff immediately walked away without responding. (Id. ¶ 119.)

Subsequently, on February 20, 2020, Plaintiff "offered several commissary purchased items to another inmate for trade purposes." (Id. ¶ 120.) Plaintiff was outside of the inmate's cell when he "realiz[ed] that a deal could not be accomplished between the two." (Id. ¶ 121.) As Plaintiff was walking away with a bag full of his items, Defendants McClellan and Newpher approached, and Defendant Newpher "snatch[ed]" the bag from Plaintiff. (Id. ¶ 122.) Defendant McClellan escorted Plaintiff back to his cell. (Id.) Plaintiff told Defendant McClellan that he had a receipt for all of the items, and Defendant McClellan responded, "so what." (Id. ¶ 123.) That night, Plaintiff received misconduct #D428421, which stated that he had entered another inmate's cell and had left with a bag of commissary. (Id. ¶ 124.) Plaintiff was charged with being present in an unauthorized area, as well as loaning and borrowing. (Id. ¶ 125.) He appeared before Defendant Miller for an informal misconduct hearing on February 26, 2020. (Id. ¶ 126.) Plaintiff asked Defendant Miller about his confiscated items, and Defendant Miller responded that there were no soaps or bags of coffee in his office. (Id. ¶ 127.) Plaintiff avers that he was sanctioned with fourteen (14) days' cell restriction "without even being asked for a version of what happened[.]" (Id. ¶ 128.) Instead, he was asked only "if he want[ed] to go through the informal hearing or if he wanted to go to the hearing examiner." (Id.)

Plaintiff also alleges that, while he was eating in the dining hall, he "abruptly got up from the table" because another inmate "was sitting ther[e] bleeding from several open sores on his face and head."  (Id. ¶ 129.)  Plaintiff filed grievance #801019, and it was rejected by the grievance coordinator, who stated that Plaintiff had "failed to indicate that he was personally affected by the Department or facility."  (Id. ¶ 130.)  Plaintiff appealed because he lived in the same housing area as the other inmate, shared the same common space, and used the same telephones.  (Id. ¶ 131.)  Plaintiff claims that the inmate walked around with open wounds on his face and head for ten (10) months.  (Id.)  Plaintiff also claims that this issue was "never investigated" despite providing "notification about a nman [sic] walking around in prison with open bleeding sores[.]"  (Id. ¶ 135.)

Finally, Plaintiff takes issue with "numerous sanitation violations in the inmate dining hall."  (Id. ¶ 136.)  Plaintiff alleges that the ceiling leaks and that water runs down the walls and splashes "onto the tables and food trays while inmates try to eat."  (Id. ¶ 137.)  Plaintiff also alleges that inmates with serious mental health issues and excessive hygiene problems are permitted to serve food and drinks.  (Id. ¶ 138.)  Plaintiff filed grievance #798305, but he did not get any relief.  (Id. ¶ 139.)  He claims that, to this day, "there are puddles on the floor and inmates are cautioned by repurposed trash cans and wet floor signs to prevent accidents[,] but people fall anyway."  (Id.)  He finally claims that the "[h]ot boxes, steam tables, and combination ovens" are "broken, inoperable[,] and vermin-infested, and [the] inmates receive cold food."  (Id. ¶ 141.)

In connection with all of these allegations, Plaintiff asserts violations of the First, Eighth, and Fourteenth Amendments to the United States Constitution, as well as a tort negligence claim, based upon allegations of retaliation, due process violations, and the various conditions of his

confinement.  (Id. ¶¶ 143-76.)   As for relief, he seeks damages, as well as declaratory and injunctive relief. (Id. at 25.)

In response to the amended complaint, Defendants filed motions to dismiss.  (Doc. Nos. 36, 56.)  By Memorandum and Order dated November 3, 2021 (Doc. Nos. 71, 72), the Court granted in part and denied in part the motions to dismiss (Doc. Nos. 36, 56).  More specifically, the Court granted the motions with respect to: (1) Plaintiff's Section 1983 claims against Defendants Wetzel and Garman; (2) Plaintiff's claims against Defendants Brubaker, McMahon, Houser, and T. Miller regarding the handling of his grievances and misconduct appeals; and (3) Plaintiff's Fourteenth Amendment due process claim regarding the loss of property.  (Doc. Nos. 71, 72.)  The Court denied the motions, however, with respect to all other claims asserted by Plaintiff.  (Id.)  The Court also denied, as moot, Defendants' motion to stay discovery (Doc. No. 57).  (Doc. Nos. 71, 72.)

On November 17, 2021, Defendants filed their answer (Doc. No. 77) to Plaintiff's amended complaint, establishing—initially—a close of discovery date of May 17, 2022.  See (Doc. No. 72 (ordering that the parties complete discovery within six months of the date on which Defendants file their answer)).  However, in light of Plaintiff's pending motions, on June 21, 2022, the Court extended the discovery deadline and directed the parties to complete discovery by September 19, 2022, and to file any dispositive motions on or before November 18, 2022.  (Doc. No. 151.)  As stated above, this Memorandum addresses Plaintiff's pending motions, as well as his request to file an amended pleading.

II.     DISCUSSION

    A.      **Plaintiff's Motion for a Temporary Restraining Order**

    Plaintiff's motion for a temporary restraining order and supporting brief appear to claim that SCI Rockview's response to the COVID-19 pandemic demonstrates deliberate indifference to an excessive risk of harm to his health and safety, presumably in violation of the Eighth Amendment to the United States Constitution.  (Doc. Nos. 108, 109.)  Plaintiff acknowledges that, in 2020, before he filed this lawsuit, SCI Rockview was "depopulat[ing]" inmates to minimize the spread of COVID-19.  (Id. at 2 (explaining that this allowed for a majority of the population at SCI Rockview to be "single[-]celled").)  Plaintiff alleges, however, that, by the end of summer 2021, SCI Rockview began to "repopulate[ ] . . . the prison and almost every housing area was filled to max capacity[.]"  (Id.)  Plaintiff alleges that, during this time of repopulation, inmates were being placed with other inmates who had been transferred from other prisons, but who had not been tested for COVID-19, despite displaying symptoms of the virus.  (Id. at 3.)  Plaintiff further alleges that there is neither a requirement at SCI Rockview for the staff or inmates alike to wear face masks nor a punishment if they do not and, additionally, the face masks that are provided by the prison are inadequate and inconsistent with those being used in society.  (Id. at 3, 6, 8.)

    Plaintiff claims that all of this has led to an increase in positive COVID-19 cases at SCI Rockview.  (Id. at 1-10.)  Thus, in light of "the dangers brought upon [him] by the actions of [Defendants] in changing their approach to [COVID-19]," Plaintiff requests that the Court enforce a temporary restraining order against Defendants by requiring them to: restore him back to single-cell status; provide double layered or KN95 face masks at the prison; and reinstate the

reduction of the population at SCI Rockview to the amount of population that existed before he commenced this lawsuit.  (Id. at 9.)[1]

The Court has reviewed Plaintiff's motion for a temporary restraining order.  While the Court is not unsympathetic to the concerns raised by Plaintiff, the Court will not grant him the extraordinary relief that he seeks.  At the outset, the Court notes that the standard for analyzing a motion for a temporary restraining order is the same as the standard for analyzing a motion for a preliminary injunction.  See Little v. Mottern, No. 14-cv-953, 2015 WL 5954350, at *1 (M.D. Pa. Oct. 13, 2015) (citing Bieros v. Nicola, 857 F. Supp. 445, 446 (E.D. Pa. 1994)).  For that reason, the Court will simply refer to Plaintiff's request for relief as preliminary injunctive relief.

That being said, the Court observes that "[p]reliminary injunctive relief is an extraordinary remedy and should be granted only in limited circumstances."  See Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004) (citation and internal quotation marks omitted); Doe by & through Doe v. Boyertown Area Sch. Dist., 897 F.3d 518, 526 (3d Cir. 2018) (reiterating that "[p]reliminary injunctive relief is an extraordinary remedy" (citation and internal quotation marks omitted)).  In determining whether to grant such injunctive relief, the Court considers the following four factors: (1) the likelihood that the moving party will prevail on the merits at a final hearing; (2) the extent to which the moving party is being irreparably harmed by the complained-of-conduct; (3) the extent to which the non-moving party will suffer irreparable harm if the preliminary injunction is issued; and (4) whether granting preliminary injunctive relief will be in the public interest.  See Ramsay v. Nat'l Bd. of Med. Examiners, 968 F.3d 251, 256 (3d Cir. 2020), cert. denied, 141 S. Ct. 1517 (2021).

---

[1]  Defendants have not filed a brief in opposition to Plaintiff's motion for a temporary restraining order.

10

"The first two factors are prerequisites for a movant to prevail."  Holland v. Rosen, 895 F.3d 272, 286 (3d Cir. 2018) (citations omitted).  Thus, "[i]f these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief."  See Reilly v. City of Harrisburg, 858 F.3d 173, 179 (3d Cir. 2017).  Ultimately, it is the moving party who bears the burden of demonstrating that these factors have been satisfied.  See Holland, 895 F.3d at 285 (explaining that preliminary injunctive relief does not issue "'unless the movant, by a clear showing, carries the burden of persuasion'" (quoting Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (per curiam))).

Upon consideration of this standard, the Court finds that Plaintiff has not demonstrated that he is entitled to the preliminary injunctive relief that he requests in his motion.  "'While '[a] preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally,' an injunction should not issue when 'it deals with a matter lying wholly outside the issues in the suit.'"  Pinson v. United States, No. 17-cv-00584, 2017 WL 5158628, at *6 (M.D. Pa. Nov. 7, 2017) (quoting De Beers Consolidated Mines v. United States, 325 U.S. 212, 220 (1945)); Adams v. Freedom Forge Corp., 204 F.3d 475, 489-90 (3d Cir. 2000) (finding that a preliminary injunction was not appropriate where the harm alleged in the request for preliminary injunctive relief was "insufficiently related to the complaint and [did] not deserve the benefits of protective measures that a preliminary injunction affords" (citations omitted)).

Here, even though Plaintiff's amended complaint alleges violations of the Eighth Amendment based upon the allegedly unconstitutional conditions of his confinement at SCI Rockview, none of those conditions pertain to the COVID-19 pandemic.  Instead, the

11

complained-of-conditions in Plaintiff's amended complaint pertain to the following: a pigeon infestation; fire safety violations; flooding in his cell and in the prison; a lack of sanitation in the inmate dining hall; piles of food garbage outside of his cell; a fellow inmate being untreated for open, bleeding sores; and various issues with the RHU, which, in turn, impacts D-Block.  In other words, none of the complained-of-conditions in Plaintiff's amended complaint pertain to the complained-of-conditions in the instant motion seeking preliminary injunctive relief. Consequently, because the nature and scope of Plaintiff's request for injunctive relief is not sufficiently related to the allegations in his amended complaint, the Court will deny his motion.

Even if the Court were to assume, however, that Plaintiff could show a sufficient relationship between his amended complaint and the nature of the preliminary injunctive relief he seeks, the Court would still find that he is not entitled to such relief because he has not established a reasonable likelihood of success on the merits.  From what the Court can discern, Plaintiff's instant motion asserts that the conditions of his confinement violate the Eighth Amendment to the United States Constitution.  The Eighth Amendment, which is "made applicable to the States through the Fourteenth Amendment, prohibits the infliction of 'cruel and unusual punishments.'"  See Glossip v. Gross, 576 U.S. 863, 876 (2015).  As explained by the United States Supreme Court, however, the Constitution "does not mandate comfortable prisons, and only those deprivations denying the minimal civilized measure of life's necessities, are sufficiently grave to form the basis of an Eighth Amendment violation."  See Wilson v. Seiter, 501 U.S. 294, 298 (1991) (internal citations and quotation marks omitted).

Thus, in order "[t]o determine whether prison officials have violated the Eighth Amendment, [courts] apply a two-prong test[.]"  See Porter v. Pennsylvania Dep't of Corr., 974 F.3d 431, 441 (3d Cir. 2020) (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)).  Under the

first prong, courts consider whether the deprivation was "'objectively, sufficiently serious[,]'" that is, whether "a prison official's act or omission [resulted] in the denial of the minimal civilized measure of life's necessities[.]'" See id. (quoting Farmer, 511 U.S. at 834).  Under the second prong, courts must consider whether the prison official was "'deliberate[ly] indifferen[t] to inmate health or safety.'" See id. (quoting Farmer, 511 U.S. at 834).

Regarding the first prong, life's necessities include food, clothing, shelter, medical care, and reasonable safety.  See Tillman v. Lebanon Cnty. Corr. Facility, 221 F.3d 410, 418 (3d Cir. 2000) (stating that "when the government takes a person into custody against his or her will, it assumes responsibility for satisfying basic human needs such as food, clothing, shelter, medical care, and reasonable safety" (citing DeShaney v. Winnebago Co. Dep't of Social Svcs., 489 U.S. 189, 199-200 (1989))); Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 256 (3d Cir. 2010) (explaining that the Eighth Amendment imposes a duty upon prison officials "to ensure that inmates receive adequate food, clothing, shelter, and medical care, and [to ensure that prison officials] take reasonable measures to guarantee the safety of the inmates" (citations and internal quotation marks omitted)).

Regarding the second prong, a prison official does not act with deliberate indifference "unless the official knows of and disregards an excessive risk to inmate health or safety"—that is, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  See Farmer, 511 U.S. at 837.  "The knowledge element of deliberate indifference is subjective, . . . meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware."  Beers-Capitol v. Whetzel, 256 F.3d 120, 133 (3d Cir. 2001) (citing Farmer, 511 U.S. at 837-38)).

Thus, "[a] claim of inhumane prison conditions may rise to the level of an Eighth Amendment violation where the prison official 'deprived the prisoner of the minimal civilized measure of life's necessities' and 'acted with deliberate indifference in doing so, thereby exposing the inmate to a substantial risk of serious damage to [his] future health.'"  See Palakovic v. Wetzel, 854 F.3d 209, 225 (3d Cir. 2017) (quoting Parkell v. Danberg, 833 F.3d 313, 335 (3d Cir. 2016)).

While the Court acknowledges that any spread of COVID-19 at SCI Rockview, or any other correctional institution for that matter, presents a potential risk of harm to the health and safety of the inmates that are confined there, the Court finds that this potential risk of harm does not suffice to plausibly allege deliberate indifference, much less demonstrate a reasonable likelihood of success on the merits of such a claim.  Plaintiff, for instance, has not alleged any facts that would demonstrate that he has a particular vulnerability to COVID-19, that Defendants knew of that vulnerability, or that they disregarded it.  Plaintiff has also not alleged any facts that would show that he was in serious need of medical treatment for exposure or even suspected exposure to COVID-19 or that Defendants disregarded such a need.  At most, Plaintiff has alleged that, since he filed this action, he "has had to use his inhaler at a more increased rate[.]" (Doc. No. 109 at 8.)  But again, Plaintiff has not tethered this allegation to a particular vulnerability or need, nor has he alleged that Defendants knew of such a vulnerability or need, yet turned a blind eye to it.

To the contrary, Plaintiff seems to acknowledge that Defendants have taken various steps at SCI Rockview to mitigate the spread of COVID-19.  Plaintiff nevertheless argues that those steps are inadequate to stop the spread of the virus and to eliminate the risk of being exposed to the virus.  (Doc. No. 109 at 2, 6 (conceding that Defendants once depopulated SCI Rockview in

2020, during Defendant Wetzel's mandate, but that they have since repopulated the prison in 2021), at 7 (conceding that Defendants have enacted several social distancing measures—such as in the chapel for church, in the dining hall, and in the visiting room—and that Defendants have also quarantined inmates when they are COVID-19 positive, but arguing that those COVID-19 positive inmates are being placed wherever there is space, including "the mental health unit"), at 8 (conceding that SCI Rockview provides face masks, but arguing that those face masks "are no good" and that the masks should be double layered, KN95 masks, or N95 masks).)

However, Plaintiff's disagreement with the steps that have been taken by Defendants at SCI Rockview to mitigate the risk of his exposure to COVID-19 is simply insufficient to plausibly allege a constitutional violation, much less meet the higher burden of demonstrating a reasonable likelihood of success on the merits of such a claim. See Hope v. Warden York Cnty. Prison, 972 F.3d 310, 330 (3d Cir. 2020) ("Although the District Court criticized the Government for the lack of 'effective containment measures,' and for not doing 'nearly enough' to combat COVID-19, those critiques are not tantamount to establishing the Government's deliberate indifference." (internal citations omitted)); see also Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987) (stating that "mere disagreement" as to defendant's response to the risk of harm to a plaintiff will not support a violation of the Eighth Amendment).

Thus, while Plaintiff may desire more ideal conditions at SCI Rockview, "ideal" prison conditions are not "a sine qua non" of constitutional conditions. See Hope, 972 F.3d at 327 (finding error in such an approach and suggesting that courts must be mindful that these types of inquiries "'spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility'" (quoting Bell v.

15

<u>Wolfish</u>, 441 U.S. 520, 539 (1979)).  Indeed, the Court is mindful that it must "defer to administrators on matters of correctional facility administration 'not merely because the administrator ordinarily will . . . have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government not the Judicial.'"  <u>See</u> <u>Hope</u>, 972 F.3d at 326-27 (quoting <u>Bell v. Wolfish</u>, 441 U.S. 520, 549 (1979)).  This is especially true in the context of COVID-19—an unprecedented, global pandemic.

Accordingly, for all of these reasons, the Court will deny Plaintiff's motion for a temporary restraining order.  (Doc. No. 108.)  Not only does Plaintiff's motion pertain to allegations and relief that are outside the scope of his amended complaint, but it falls well-short of demonstrating a reasonable likelihood of success on the merits, an element that is essential to the Court granting such extraordinary relief.

**B.**     **Plaintiff's Motion for Sanctions**

In addition, Plaintiff seeks sanctions based upon defense counsel's purported misconduct during the course of discovery in this litigation.  (Doc. Nos. 103, 110.)  Both the Local Rules of this Court and the Federal Rules of Civil Procedure authorize the imposition of sanctions for such misconduct during discovery.  More specifically, Local Rule 37.1 provides, in pertinent part, as follows:

**L.R. 37.1 Discovery Abuse, Sanctions for.**

> [T]he court may impose upon any party or counsel such sanctions as may be just, including the payment of reasonable expenses and attorney's fees, if any party or attorney abuses the discovery process in seeking, making or resisting discovery.

See M.D. Pa. L.R. 37.1; see also M.D. L.R. 83.3.3 (stating that "the court may impose sanctions in discovery matters as set forth in Local Rule 37.1").  Additionally, Federal Rule of Civil Procedure 37(d) states, in pertinent part, as follows:

> **(d) Party's Failure to Attend Its Own Deposition, Serve Answers to Interrogatories, or Respond to a Request for Inspection.**
>
> > **(1) In General.**
> >
> > > (A) Motion; Grounds for Sanctions. The court where the action is pending may, on motion, order sanctions if:
> > >
> > > > (i) a party or a party's officer, director, or managing agent- -or a person designated under Rule 30(b)(6) or 31(a)(4)-- fails, after being served with proper notice, to appear for that person's deposition; or
> > > >
> > > > (ii) a party, after being properly served with interrogatories under Rule 33 or a request for inspection under Rule 34, fails to serve its answers, objections, or written response.
> > >
> > > (B) Certification. A motion for sanctions for failing to answer or respond must include a certification that the movant has in good faith conferred or attempted to confer with the party failing to act in an effort to obtain the answer or response without court action.

See Fed. R. Civ. P. 37(d)(1).

Whether to impose sanctions under Rule 37 for a discovery violation is a determination that is committed to the sound discretion of the district court.  See Bowers v. Nat'l Collegiate Athletic Ass'n, 475 F.3d 524, 538 (3d Cir. 2007), amended on reh'g (Mar. 8, 2007) (stating that "[t]he decision to impose sanctions for discovery violations and any determination as to what sanctions are appropriate are matters generally entrusted to the discretion of the district court" (citation omitted)); Clientron Corp. v. Devon IT, Inc., 894 F.3d 568, 580 (3d Cir. 2018) (stating, in the context of Rule 37, that "the decision to impose sanctions is 'generally entrusted to the discretion of the district court'" (quoting Bowers, 475 F.3d at 538)).

Potential sanctions for a violation of Rule 37(d) "include any of the orders listed in Rule 37(b)(2)(A)(i)-(vi)." See Fed. R. Civ. P. 37(d)(3).  That list includes orders "directing that . . . designated facts be taken as established for purposes of the action, as the prevailing party claims; . . . prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence; . . . striking pleadings in whole or in part;" and "rendering a default judgment against the disobedient party[.]"  See Fed. R. Civ. P. 37(b)(2)(A)(i)-(iii), (vi).  In addition, under Rule 37(d)(3), "the court must require the party failing to act, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust."  See Fed. R. Civ. P. 37(d)(3).

Here, Plaintiff's motion for sanctions is largely, if not entirely, based upon his interrogatories that were directed to Defendant Wetzel.  (Doc. Nos. 103, 110.)  Plaintiff alleges that defense counsel violated Rule 33(b)(1)(A) (id. at 4) because he did not serve Defendant Wetzel with the interrogatories and instead served Plaintiff with a letter "identifying certain corrections staff that are alleged to have . . . worked" on dates relevant to the amended complaint—i.e., December 3, 2018, and January 23-24, 2019 (id. at 1-2).  Plaintiff argues, however, that the individuals defense counsel identified have since denied working on those dates.  (Id. at 3-4 (explaining that Plaintiff received an interrogatory response, wherein: Defendant Narehood "denies working [on] December 3, 2018[;]" Defendant Eyer "denies working on D-block on the date of January 23-24, 2019[;]" and Defendant Kachik claims "that he was on vacation on . . . December 3, 2018").)  In addition, Plaintiff alleges that he subsequently received interrogatory responses from Defendant Wetzel, which included a response from Nicki J. Paul, a legal liaison for SCI Rockview, who identified the corrections

18

officers that worked on December 3, 2018.  (<u>Id.</u> at 3; <u>id.</u> at 7 (alleging that Defendant Wetzel's response identified corrections officers R. Holdren, R. Best, J. Coudriet, C. Fisher, and C. Baney).)

In connection with all of these allegations, Plaintiff argues that "[t]his matter" could have been resolved months ago (<u>id.</u>) and that defense counsel's "bad faith efforts" have negatively impacted Plaintiff, causing him to file the instant motion for sanctions in order to "curb the harm" he has suffered (<u>id.</u> at 5).  As for relief, Plaintiff requests the following: that he be permitted to amend his amended complaint; that the discovery deadline be extended; and that sanctions be entered against defense counsel "for legal fees" in the amount of $1,400 to deter counsel from engaging in such "unprofessional[ ]" conduct in the future.  (<u>Id.</u> at 7.)

Defense counsel, in turn, has acknowledged that mistakes were made, but argues that those mistakes were not the product of some "malicious scheme."  (Doc. No. 112 at 1.)  Defense counsel also argues that Plaintiff is not an attorney and, thus, his request for attorney's fees is without merit.  (<u>Id.</u> at 2.)  Defense counsel also explains that, "[i]f the case has to be amended, Defendants will not object if the request is timely."  (<u>Id.</u>)

The Court, having reviewed the parties' respective arguments, will utilize its discretion to grant in part and deny in part Plaintiff's motion for sanctions.  Although Plaintiff understandably takes issue with the process surrounding the interrogatory requests that were directed to Defendant Wetzel and propounded upon defense counsel, Plaintiff acknowledges that he eventually received interrogatory responses from Defendant Wetzel and that, in connection with those responses, he was provided with the names of additional corrections officers who allegedly worked on at least one of the dates relevant to his pleadings.  In addition, the Court reiterates defense counsel's statement that, Plaintiff, as a self-represented, non-lawyer litigant, may not

recover attorney's fees.  See, e.g., Kay v. Ehrler, 499 U.S. 432, 435 (1991) ("Kay") (noting that "[t]he Circuits are in agreement . . . on the proposition that a pro se litigant who is not a lawyer is not entitled to attorney's fees" under 42 U.S.C. § 1988, the Civil Rights Attorney's Fees Award Act (emphasis in original)); Pitts v. Vaughn, 679 F.2d 311, 313 (3d Cir. 1982) ("Pitts") (holding that pro se, non-lawyer litigants are not entitled to an award of attorney's fees under 42 U.S.C. § 1988); Zucker v. Westinghouse Elec., 374 F.3d 221, 227-28 (3d Cir. 2004) (recognizing this principle from Kay and Pitts).  Thus, to the extent that Plaintiff seeks attorney's fees for defense counsel's alleged misconduct during discovery, the Court will deny Plaintiff's motion for sanctions.

The next question is whether Plaintiff should be granted an opportunity to amend his amended complaint so that he can name as defendants the corrections officers that were identified during discovery.  As noted above, it appears that Defendants do not object to Plaintiff amending his amended complaint "if the request is timely."  (Doc. No. 112 at 2.)  Thus, because Defendants generally do not object to Plaintiff's request, and because Plaintiff has seemingly learned the correct identity of the corrections officers relevant to his case, the Court will allow Plaintiff to file a motion to amend his amended complaint, along with a brief in support, and a proposed second amended complaint.  Defendants will be permitted to respond to Plaintiff's motion in accordance with the Local Rules of this Court.

Accordingly, because the parties will need additional time to address the preliminary issue of whether Plaintiff should be permitted leave to file a second amended complaint, the Court will stay discovery in this matter pending resolution of that issue.  Thus, to the extent that Plaintiff has filed a recent motion to extend the discovery deadline, the Court will deny his

request as moot.  The Court will set a new discovery deadline once it has resolved the issue of Plaintiff's request to file a proposed second amended complaint.

Finally, to the extent that Plaintiff has filed a motion seeking a court-appointed expert witness, the Court will deny his request as he "is not entitled to a court appointed expert witness to assist in this civil action."  See Hodge v. United States, No. 3:06-cv-1622, 2009 WL 2843332, at *6 (M.D. Pa. Aug. 31, 2009), aff'd sub nom. Hodge v. U.S. Dep't of Just., 372 F. App'x 264, 268 (3d Cir. 2010) (unpublished); Boring v. Kozakiewicz, 833 F.2d 468, 474 (3d Cir. 1987) (concluding that "[t]he plaintiffs' dilemma in being unable to proceed in this damage suit because of the inability to pay for expert witnesses does not differ from that of nonprisoner claimants who face similar problems").  Thus, while Plaintiff, as a pro se litigant, may use the discovery methods set forth by the Federal Rules of Civil Procedure, he is responsible for his own litigation expenses, see, e.g., Tabron v. Grace, 6 F.3d 147, 159 (3d Cir. 1993) (stating that "indigent litigants bear their own litigation expenses . . . "), and the Court has no authority to finance, or to require Defendants to finance, such expenses.  See, e.g., id. at 159 (stating "that there is no statutory authority for a court to commit federal funds to pay for deposition transcripts").  All other pending discovery motions will, however, be stayed pending resolution of whether Plaintiff should be permitted leave to amend.  (Doc. Nos. 137, 148, 149, 154.)

## III.    CONCLUSION

For the foregoing reasons, the Court will deny Plaintiff's motion for a temporary restraining order, grant in part and deny in part Plaintiff's motion for sanctions, and deny Plaintiff's motion seeking the appointment of an expert witness.  The Court will afford Plaintiff an opportunity to file a motion to amend his amended complaint, along with a brief in support and a proposed second amended complaint.  In doing so, the Court will stay discovery in this

matter pending resolution of Plaintiff's forthcoming motion to amend.  The Court will also deny,

as moot, Plaintiff's motion for an enlargement of the discovery deadline.